**Henry Gene CADY et ux., Plaintiff,**

v.

**E. I. DuPONT de NEMOURS & COMPANY, Defendant.**

**Civ. A. No. 75–H–1261.**

United States District Court,
S. D. Texas,
Houston Division.

Sept. 30, 1977.

Ira Watrous, Watrous & Conner, Inc., Houston, Tex., for plaintiff.

Richard C. Keene, San Antonio, Tex., for intervenor.

Kelly D. Williams, Fulbright & Jaworski, Houston, Tex., for defendant.

*Memorandum Opinion*

SINGLETON, District Judge.

Plaintiff Henry Gene Cady filed this action as a result of injuries he sustained on the defendant's premises on August 12, 1974. On that date, Mr. Cady was employed by H. B. Zachary & Company (hereinafter "Zachary") as a structural iron worker. His employer was an independent contractor hired by the defendant, E. I. DuPont de Nemours & Company (hereinafter "DuPont"), to erect a structure designated as the "J–Line Project." DuPont had designed and engineered the completed structure which was to be constructed on property which is owner and occupied by DuPont in New Victoria, Texas.

The case was tried to a jury and, on June 27, 1977, at the close of all the evidence, the court granted the defendant's motion for a directed verdict. In granting the motion, this court carefully considered all of the evidence in the light most favorable to the plaintiff and concluded that there was no "conflict in substantial evidence." *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969) (*en banc*).

Some undisputed factual background is necessary. In the early stages of erecting the steel framework for the J–Line Project, the plaintiff and his fellow employees set two vertical steel columns, approximately twenty feet apart, into recesses in the slab and bolted down each column's baseplate. On each column, at a level of fifteen feet, a crossbeam was bolted in a position perpendicular to the line of the two columns. The next step called for two twenty-foot pieces of channel iron to be connected to the ends of the crossarms between the columns. After having connected one such channel iron, the plaintiff slid to the opposite end of the crossarm connected to column C–3 for the purpose of connecting the other channel iron which was being hoisted by a "cherry picker." During the final stages of making that connection, the plaintiff's co-worker, who had connected the other end of the channel iron to the crossbeam attached to column C–4, began to slide down the channel iron to assist the plaintiff. It is undisputed that the resulting eccentric force placed on the ends of the crossbeam of column C–3 caused that column to tilt approximately fifteen degrees (15°), causing Mr. Cady to either jump or fall to the ground. There is conflicting evidence as to whether Mr. Cady fell or jumped, but such a conflict is not material to the granting or denying of the motion for a directed verdict.

The plaintiff contends that the structure (specifically, the base support of the column C–3) was defectively and/or negligently designed by DuPont. In the alternative, the plaintiff has argued that DuPont was negligent in the manner in which it permitted

**1032**

Mr. Cady's employer to erect the structure. DuPont denies any negligence and any defect in the design of the structure.

■ The evidence presented overwhelmingly establishes that there was no defective design. The product, the design of which is claimed to be defective, is not merely, as the plaintiff has argued, the column support. Rather, the product is the completed J–Line structure, one aspect of the design of which is challenged. Similarly, the plaintiff has argued that the design refers only to the engineering drawings and not to the engineering specifications. The court rejects this narrow interpretation, and in determining whether the plaintiff has raised a disputed fact issue to be submitted to the jury on the issue of a defective or negligent design, this court considers the relevant aspects of the design to include the drawings and the implementing specifications to which the drawings specifically refer. Engineering drawing W483193 (Plaintiff's Exhibit No. 3) incorporates by reference Standard Engineering Specification SB 13 U (Defendant's Exhibit No. 1).

That specification requires in sections 4.6 and 4.6.2, that the baseplate of a column be grouted to the slab in a prescribed manner. Depending on the type of grout used, the contractor must either use four grout pads with steel shims on the corners of the baseplates or use two elongated grout pads with steel shims set so that the shims are parallel to the axis of the bolts. Specification SB 13 U §§ 4.6.2 permits no other method. The primary purpose of these grout pads in multistory buildings is to allow the columns to be adjusted for a uniform height and be placed in a true vertical position. The expert testimony is undisputed that had column C–3 been erected according to the plans and specifications supplied by DuPont, it would not have tilted. Either of the two methods of grouting the column baseplates required by SB 13 U would, according to the plaintiff's own expert, have prevented the accident.

As originally designed, therefore, no defect existed. Instead, there is uncontroverted evidence that the plaintiff's employer, Zachary, in erecting column C–3 failed to comply with the grouting technique required by SB 13 U. The independent contractor elected instead to use a 4″ × 4″ grout pad between the two anchor bolts. The testimony reveals that the use of this one pad provides a time-saving method of leveling the baseplate and erecting the column to its proper height.

In the accident on August 12, 1974, the force applied to column C–3 caused the column to tilt in a line perpendicular to the axis of the two bolts. The evidence is undisputed that one square grout pad between the bolts did not provide the necessary support to prevent the tilting as would have either one of the two approved and required methods.

The plaintiff has emphasized testimony from the engineering experts to the effect that had the axis of the bolts been placed in a north-south line, as opposed to the east-west line as designed, the column would not have tilted. The court does not consider such testimony to raise a jury question of defective design. It is important to realize that anchor bolts do not serve as the means of lateral support; rather, they are used to maintain the vertical strength of the column. Consequently, an interior column, such as C–3, had only two anchor bolts while a corner column, such as C–4, required four anchor bolts. As an interior column, C–3 would rely on the other cross members for its lateral support in the *completed* structure. As designed (using SB 13 U) the axis of the bolts would not have affected the stability of the column. Design alternatives unrelated to safety could not legally give rise to a finding of a design defect. It is only as a result of the abandonment of the specifications that the axis of the bolts played any role in the stability of the column during construction.

■ Therefore, the plaintiff has failed to produce any evidence to support a finding that the design of the structure as it relates to the support of column C–3 is defective.

■ Moreover, the engineering design of any structure is one geared to a sound

completed structure. In the process of implementing the design during construction, there is by necessity some temporary instability. For example, in the completed J–Line Project, experts testified that column C–3 receives support from the entire grid of channel irons and crossbeams; however, before final completion, the members are not in their most stable condition. The manner in which a structure is assembled is committed to the expertise of the contractor. Thus, Texas courts have long recognized that during construction the contractor, rather than the designer, is responsible for the structural stability of the structure, even where the instability arises out of a flaw in the designer's plans. *Lonergan v. San Antonio Loan & Trust Co.,* 101 Tex. 63, 104 S.W. 1061 (1907); *Benson v. Gunn & Briggs, Inc.,* 438 S.W.2d 896 (Tex.Civ.App. —Fort Worth 1969, writ ref'd n. r. e.).

In addition to the absence of a jury question as to whether the design was defective, there has been no evidence to support a finding that DuPont was in any way negligent in its design.

Recognizing the undisputed fact that Du-Pont's design for the base of column C–3 was not followed by H. B. Zachary & Company, the plaintiff argues that DuPont knew of the use of the center 4″ × 4″ grout pads in the J–Line Project and that such knowledge constitutes a waiver of the original design, specifically SB 13 U. Donald Borders, an engineer with DuPont who had general supervisory responsibility over the J–Line Project, testified that he was aware of Zachary's use of the 4″ × 4″ grout pad and was familiar with such technique. Mr. Borders denies having any authority to change the written specifications on the job site. Even assuming authority, at most his knowledge of the center grout pads might be considered a waiver of SB 13 U for limited purposes.

If there is a waiver, the plaintiff argues, either it constituted a new, albeit impromptu, design which is defective or the waiver of the specifications coupled with a duty to warn of the danger constitutes negligence. Both approaches, when considered in light of the most favorable evidence, are without legal effect.

If the evidence of the use of the center 4″ × 4″ grout pad with the consent of Mr. Borders is deemed to create a new design, there is no evidence to support a finding that the new design is defective. All of the experts, including those who testified for the plaintiff, testified that there is nothing unstable about the use of the center grout pad as long as an independent means of support is used during construction. Once construction is completed, the column receives its stability from the other members of the structure. The independent means of support suggested by the experts are guy wires or the "cherry picker," which was on the construction site under the control of Zachary. There is no evidence that DuPont knew or should have known that Zachary would not use independent support during construction. As explained *infra,* DuPont has a right to expect that Zachary will perform its responsibilities in a safe and workmanlike manner and take proper care to assure the safety of its employees. The instability without guy wires or the "cherry picker" is, according to undisputed testimony, as readily apparent to Zachary and its engineers as to DuPont and its engineers. A column with a center grout pad only creates an unstable condition when not erected properly, i. e. without other support.

The plaintiff again argues that changing the axis line of the bolts to a north-south line would have removed any defect in the "new design." However, the court again must find from the undisputed evidence that the design itself for the finished product is safe. It is only the contractor's failure to use independent support during construction that led to the accident. The plaintiff may not prove a defect by proof of injury alone and ignore the actions of Zachary.

The final theory of liability advanced by the plaintiff alleges that any waiver of the specifications created a hazardous condition of which the defendant, as owner and occupier of the land, had a duty

to warn his invitees and that the waiver and failure to warn gives rise to negligence. The foundation of any duty to warn is in a determination of which party is in the best position to be aware of the risk and issue the warning. *Delhi-Taylor Oil Corp. v. Henry,* 416 S.W.2d 390 (Tex.1967). Under circumstances where the danger is not open and obvious and is not known to the invitee, a duty to warn is imposed on the owner-occupier. However, the facts presented by the plaintiff do not create such a duty. It is undisputed that the invitee H. B. Zachary created the dangerous condition either by not following the specifications or by failing to use independent means of support for column C–3 during erection once deciding to use the center grout pad. As a construction company, Zachary holds itself out as an expert in dealing with the necessary dangers created during a structure's erection.

 The construction of the J–Line Project, and the manner in which DuPont's design was implemented was under the direct supervision and control of Zachary. The danger having arisen out of that construction, the duty to warn the plaintiff is that of his employer and not that of the owner-occupier. *Abalos v. Oil Development Co. of Texas,* 544 S.W.2d 627 (Tex.1976). In *Abalos,* as here, no dangerous condition existed when the plaintiff and his employer entered on the land. The owner-occupier is under no duty to warn an independent contractor or his employee of a dangerous condition created by other employees of the same contractor. *Pence Construction Corp. v. Watson,* 470 S.W.2d 637 (Tex.1971). Even though there is no evidence that Mr. Cady or any other Zachary employee actually knew of the danger, the evidence is undisputed that the danger arose out of the performance of the construction work for which Zachary was employed. Under such circumstances the general principles of *Pence* must apply. *Shell Chemical Co. v. Lamb,* 493 S.W.2d 742 (Tex.1973). In *Lamb,* the general contractor was in the same position as DuPont. (With regard to the duty a general contractor owes to a subcontractor's employees, the general contractor is in the same position as an owner-occupier.) The court held:

The dangerous condition in the instant case was peculiar to the technical specialty for which Fisk (the invitee) was employed. Fisk had a duty to perform its work safely, and Fisk was in a superior position to prevent the existence of, to inspect for, and to eliminate or warn its employees of this dangerous condition. This circumstance is not one of those in which a general contractor [or owner-occupier] is required to take the extra measures referred to in the *Pence* case. Instead, this is a circumstance in which the general contractor is not required to anticipate the failure of its subcontractor to discharge its duty to its own employees.

493 S.W.2d at 748.

Mr. Cady has argued that the general supervisory nature of Mr. Borders' responsibility created a special circumstance thereby imposing a duty to warn. There is, however, no evidence to support such a conclusion. Mr. Borders made it clear that he was primarily concerned with scheduling and seeing that Zachary met its contractual obligations to DuPont. Even though there is evidence that he knew of the use of the center grout pad, neither Mr. Borders nor DuPont was aware that Zachary would not use independent support for column C–3 and not exercise properly its duty to its own employees. As the expert in construction and as the creator of the risk, Zachary is in no different position than Fisk in the *Lamb* case and no special duty was imposed on DuPont by Mr. Borders. In *Abalos,* the plaintiff, an employee of the invitee, was denied recovery from the owner-occupier even though agent for the owner observed the plaintiff enter the zone of risk, because the danger was created by the invitee and the instrumentality which injured the plaintiff was in the control of the invitee.

Therefore, after having viewed all of the evidence in a light most favorable to the plaintiff, this court is convinced that no jury question has been raised and that the facts held in the proper light are so over-

whelmingly in favor of the defendant that reasonable men, under proper instruction of the law involved, could not differ. Accordingly, this court granted the defendant's motion for a directed verdict.